## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

KIA KAVIANI, D.M.D.

      Plaintiff,

                            Case No.: 6:16-CV-2061-Orl-41DCI

v.

RELIANCE STANDARD LIFE
INSURANCE COMPANY,

      Defendant.

_____/

### PLAINTIFF'S DISPOSITIVE MOTION FOR SUMMARY JUDGMENT
### AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, Kia Kaviani, D.M.D. ("Dr. Kaviani"), pursuant to Fed. R. Civ. P. 56, moves for summary judgment against Defendant, Reliance Standard Life Insurance Company ("RSL"), and states:

## I.      BACKGROUND

After 15 years of employment as a dentist at Greenberg Dental & Orthodontics ("Greenberg Dental"), Dr. Kaviani submitted his resignation, effective August 7, 2015, due to disability. Since suffering a cervical spine injury in an automobile accident in 2012, Dr. Kaviani has struggled with varying degrees of pain, headaches, and other symptoms, including tingling, weakness, and numbness in his arms, hands, and fingers. As is typical with non-catastrophic auto-related injuries, Dr. Kaviani returned to his occupation and sought to carry-on with his professional career.

However, there came a point where the pain and other symptoms – whether due to effects of aging or the posture associated with practicing dentistry, or, likely, both – crossed a threshold

that constitutes occupational-disability. Accordingly, Dr. Kaviani submitted his claim for long-term disability ("LTD") benefits with RSL. Dr. Kaviani did not claim to be completely incapable of engaging in activities. Rather, his disability claim is based on an inability to <u>safely</u> do one thing: practice as a dentist.

RSL insures the long-term disability insurance policy (the "Policy") at issue and also administers claims for benefits, a situation the Supreme Court recognizes to be an inherent conflict of interest.[1] Unlike the majority of employer-sponsored disability policies, which have the stricter "any occupation" definition of disability, the Policy here is *own-occupation* specific, meaning Dr. Kaviani is considered disabled if he cannot perform the duties of a dentist.

Here, the very nature of Dr. Kaviani's occupation is what prevents him from continuing to practice. To effectively perform dental procedures, Dr. Kaviani had to bend forward at the waist and mid-back, tilt his head forward or at a sideward angle, and look downward while extending both hands outward toward the patient. More complex or longer dental procedures required him to maintain this static position for prolonged periods of time without support or bracing for his body. After a day's work, Dr. Kaviani would go home in pain. After a week at work, his pain was greatly exacerbated.

When RSL denied Dr. Kaviani's claim, he appealed and sought to put to rest any serious contention that he did not qualify for benefits by presenting overwhelming evidence of disability. When his appeal was also denied, he brought this suit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, to pursue his benefits.

---

[1] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112, 128 S.Ct. 2343, 2348, 171 L.Ed. 2d 299 (2008).

## II.    SUMMARY OF ARGUMENT

With great power comes great responsibility. As a plan administrator and fiduciary with discretionary authority, RSL is bestowed with the power to interpret and apply the terms of the Policy. But because of this power, RSL is held to a "higher than marketplace" standard. *Glenn*, 554 U.S. at 118. Indeed, ERISA insists that RSL discharge its duties with "care, skill, prudence, and diligence." 29 U.S.C. § 1104(a)(1)(B). As a fiduciary, RSL must act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1)(A); *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

RSL's task is not an easy one. To be sure, there is no checklist for a proper claim review. Nor can any doctor give RSL the answer to whether the terms of the Policy are met. Instead, RSL must engage in a "deliberate, principled reasoning process." *See Glenn v. MetLife,* 461 F.3d 660, 666 (6th Cir.2006), *aff'd Metro. Life Ins. Co. v. Glenn,* 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed. 2d 299 (2008). That process requires RSL to consider *all* of the evidence – that supplied by the claimant *and* that supplied by RSL's reviewing physicians – with purpose and reason. With that information in mind, RSL then answers the ultimate question of whether the evidence supports that the insured is Totally Disabled – a defined term in the Policy. As the fiduciary, that is RSL's task alone.

Here, RSL failed in that task. Though RSL will, no doubt, argue that its discretionary authority demands great deference, discretion cannot save RSL here. RSL failed in its basic responsibility to reasonably and neutrally evaluate Dr. Kaviani's claim when it: (1) ignored and de-emphasized substantial evidence of disability; (2) failed to investigate significant patient safety concerns related to Dr. Kaviani's ability to work as a dentist; and, (3) adopted the opinions of its reviewing physicians even when those opinions were contrary to the terms of the Policy.

## III.     STATEMENT OF UNDISPUTED MATERIAL FACTS

Unless otherwise specified, the following facts derive from documents produced by RSL as its "Administrative Record" with the letters "AR" followed by stamped numbers:

1.     Dr. Kaviani was employed as a dentist with Greenberg Dental for 15 years. [AR 750].

2.     By virtue of his employment, he was a participant of the Policy RSL issued to Greenberg Dental. [DE 3, *Def's Ans.*, at ¶ 5].

**The LTD Policy and LTD Benefits**

3.     The Policy provides a monthly benefit of 60% of monthly earnings for Class 1 employees with a maximum benefit of $8,000 per month. [AR 1- 31 at 7].

4.     Dr. Kaviani would qualify for the maximum monthly benefit. [AR 42].

5.     The potential maximum duration of benefits is age 67. [AR 7-8].

6.     "Totally Disabled" means that as a result of an Injury or Sickness, the insured cannot perform the substantial and material duties of his/her Regular Occupation. [AR 10].

7.     Dr. Kaviani's "Regular Occupation" is a dentist. [AR 170].

8.     "Partially Disabled" means the insured is capable of performing the substantial and material duties of his/her Regular Occupation on a part-time basis or some of the substantial and material duties on a full-time basis. An insured who is Partially Disabled will be considered Totally Disabled, except during the Elimination Period. [AR 10].

9.      "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability. [AR 10].

4

**Dr. Kaviani's Disability**

10.     On April 20, 2012, Dr. Kaviani was involved in an accident where his automobile was struck from behind. [AR 368; 845-859 at 851].

11.     Two days after his automobile accident, Dr. Kaviani was treated in the emergency room due to back and neck pain. He was diagnosed with cervicalgia. [AR 845-859 at 845].

12.     An MRI completed May 15, 2012 revealed abnormalities at C3-C4, C4-C5, and C5-C6 showing the following:

- At C3-C4, there is a focal central herniation of the disc with a rupture of the annulus. This results in mild stenosis of the spinal canal to 1.0 cm. There is no evidence for foraminal stenosis.
- At C4-C5, there is disc bulging which causes an anterior impression on the thecal sac. No canal stenosis or foraminal stenosis is identified.
- At C5-C6, there is disc bulging which causes an anterior impression on the thecal sac. No canal stenosis or foraminal stenosis is identified.

[AR 701-702].

13.     Since the automobile accident, Dr. Kaviani has treated with Dr. Richard Smith, an orthopedic surgeon, for neck pain radiating to his shoulder, arms, hands, fingers, weakness, numbness, tingling, and restless sleep. [AR 402-479; 1138-1139; 888-889; 905-907; 949-950]. He has also treated with Dr. Marc Sharfman, a neurologist, for headaches with neck and back pain. [AR 485-494; 1140-1141].

14.     In June 2015, after obtaining an updated MRI report, Dr. Smith recommended that Dr. Kaviani change occupations. [AR 890-891].

15.     By letter dated July 10, 2015, Dr. Kaviani submitted his resignation to Greenberg Dental. His resignation became effective August 7, 2015. [AR 800]. He then placed his dental license in "retired" status. [AR 989].

16.     By letter dated August 14, 2015, Dr. Kaviani submitted his LTD claim to RSL. [AR 388-399; 392-396].

17.     Dr. Kaviani's LTD claim was supported by a Physician's Statement completed by Dr. Smith, which stated that Dr. Kaviani "cannot continue current occupation," due to neck pain, tingling/ numbness in both upper extremities. Dr. Smith's Physician's Statement cited MRI results revealing cervical HNP/ disc bulges as supportive objective findings and he indicated a cervical discectomy would likely be needed in the near future. [AR 207-208].

18.     Dr. Kaviani also submitted an Activities of Daily Living Questionnaire in which he wrote "[t]he pain that I suffer as the result of the spinal injury in my neck is severe and does not allow me to perform my job as a dentist properly. The posture I have [sic] be in to do dentistry makes my condition worse. I am unable to do proper treatment on patients." [AR 990-997 at 996].

**RSL's Claim Review**

19.     At RSL's behest, John L. Zurick, M.Ed., LPC, CRC, a rehabilitation specialist, completed an occupational analysis on December 3, 2015. [AR 926-928].

20.     The occupational analysis concluded that dentistry is a light level occupation, which requires frequent reaching, handling, and fingering. Dentistry requires finger dexterity in the above 89th percentile range and manual dexterity in the 67-89th percentile range. [AR 927].

21.     At RSL's behest, Dr. Dan Gerstenblitt conducted a medical examination of Dr. Kaviani on February 8, 2016. [AR 1106-1118; 156-157].

22.     In a February 8, 2016 questionnaire, Dr. Gerstenblitt checked boxes indicating that Dr. Kaviani could continuously (defined as 67%-100% of an 8-hour work day) complete all activities identified, but hand wrote that Dr. Kaviani could perform firm grasping "only

occasional" and that there "may be potential patient safety issue if continues his own job." [AR 1119].

23.     In his February 9, 2016 report, Dr. Gerstenblitt wrote, "for whatever reason if the examinee indicates he cannot grasp his tools or there could be a concern that he may injure a patient being that he is a dentist in drilling in someone's teeth and that decision would have to be made whether that is a reasonable risk involved in this case." [AR 1111].

24.     RSL requested Dr. Gerstenblitt clarify why he had given a restriction of occasional firm grasping, but did not ask for any additional information regarding his concern for patient safety. [AR 1115-1117].

25.     Dr. Gerstenblitt claimed that Dr. Kaviani's pain is self-reported and subjective, but found his "neck range of motion was markedly reduced." [AR 1106-1117 at 1110].

26.     Dr. Gerstenblitt did not have any previous MRIs from Dr. Kaviani's medical records, but reviewed the June 23, 2015 MRI and claimed it was "unimpressive and essentially a normal study." [AR 1112].

27.     The June 23, 2015 MRI report revealed:

- At C4-5, there is bulging of the disc. This results in anterior impression on the thecal sac.
- At C5-6, there is bulging of the disc. This results in anterior impression on the thecal sac.
- At C6-7, there is focal posterior disc herniation, best seen on Image 8, series 601: There is anterior impression on the thecal sac. There is disc bulge.

[AR 408-409].

28.     According to Dr. Gerstenblitt, pain is a matter of tolerance and being uncomfortable doing a certain activity is not a basis upon which to give restrictions. [AR 1115; Ex. A - Gerstenblitt Dep., 36:19-23].

29.    In regard to Dr. Kaviani's statement on his activities of daily living questionnaire that his posture when treating patients makes his condition worse, Dr. Gerstenblitt remarked, "[t]hat is also consistent with patient 'tolerance' and is not objective." [AR 1115].

30.    Dr. Gerstenblitt stated that due to the risk to patients associated with dropping instruments Dr. Kaviani "would probably have to modify his activities to doing other tasks where he wouldn't be necessarily doing patient care kind of tasks." [Ex. A - Gerstenblitt Dep., 52:21-25]. When asked if he would volunteer to be a patient of Dr. Kaviani's after examining him and providing the restrictions he identified, Dr. Gerstenblitt stated "probably not." [Id. at 53:1-4].

31.    Dr. Gerstenblitt did not voice any concern regarding Dr. Kaviani's trustworthiness and/or veracity. [AR 1106-1117]. He testified that he did not believe Dr. Kaviani was intending to deceive him and when asked whether Dr. Kaviani was honest, he stated, "[t]here's no reason to disbelieve him." [Ex. A - Gerstenblitt Dep., 49:18-19, 56:4-7].

32.    By letter dated March 10, 2016, RSL denied Dr. Kaviani's claim. ("Denial Letter"). [AR 169-178].

33.    RSL's Denial Letter repeatedly cites Dr. Gerstenblitt's report. [AR 169-178].

34.    RSL stated the risks of harm that Dr. Gerstenblitt identified did not alter their decision because the risks assume the presence of a medical condition which they believe has not been established. [AR 177].

**Dr. Kaviani's Appeal**

35.    Via letter dated August 25, 2016, Dr. Kaviani appealed RSL's denial of his LTD claim. [AR 1125].

36.    His appeal was supported by, among other things: (1) updated treatment notes from physical therapy; (2) updated treatment notes from Dr. Richard Smith; (3) updated treatment notes

8

from Dr. Marc Sharfman; (4) a Functional Capacity Evaluation ("FCE") report; (5) an Independent Medical Evaluation ("IME") report and Neurophysiologic Pain Profile Report from Dr. David Ross; (6) a letter from Dr. David Ross discussing the FCE results; (7) a sworn statement from Dr. Marc Sharfman; (8) a letter from Dr. Kaviani's former boss, Dr. Andrew Greenberg; (9) a peer review report by independent orthopedic surgeon Dr. Stephen Wender; and, (10) declarations from two Greenberg Dental employees. [AR 1125-1126].

37.     The physical therapy notes document neck pain and therapy goals of restoring Dr. Kaviani's previous level of functionality, reducing pain, improving range of motion, and teaching a home exercise program. [AR 1135].

38.     The updated records from Dr. Smith note aching, throbbing, sharp, and gnawing neck pain, right arm pain, left arm pain, radiating to arms, radiating to hands/ fingers, which is relieved approximately 25% with pain medications. The diagnoses include displacement of cervical intervertebral disc without myelopathy, cervical disc displacement, cervicalgia, and radiculopathy of the cervical region. [AR 1138-1139].

39.     The updated records from Dr. Sharfman note daily headache, neck pain, upper extremity numbness/ tingling, which make it difficult for Dr. Kaviani to utilize his instruments safely. Objective findings upon physical examination include cervical spasms, decreased range of motion, tenderness, moderate tenderness of the pericranial musculature, positive tenderness over the greater occipital notches on the right and left, and decreased RC7 and LC8 reflexes. Dr. Sharfman diagnosed cervicocranial syndrome, cervicobrachial syndrome (diffuse) and cervical disc disorder with radiculopathy, mid-cervical region. [AR 1140-1141].

40.     The FCE report concluded that Dr. Kaviani's "right UE reaching and handling is below functional as demonstrated with his grip strength, UE shoulder ROM/Strength and his

endurance to repetitive hand use and shows inability to safely perform the essential job demands of a dentist." [AR 1143-1169].[2]

41.     The FCE report states that "[t]he results of this evaluation show that Dr. Kaviani demonstrated consistent and maximal effort. The test results and referral diagnosis correlate. Therefore, this FCE is a reliable indication of his true functional abilities at this time." [AR 1144].

42.     Dr. Ross's IME report concluded that:

[w]hen scientifically valid methods are applied, the relevant records and examination shows that the patient has a chronic pain syndrome comprised of cervical myofascial discomfort complicated by cognitive and emotional factors. Given the nature of Dr. Kaviani's profession, he cannot safely perform his work obligations. Even with further treatment, it is improbable that he will be able to return to work as a dentist in the foreseeable future. [AR 1182].

43.     Asked to comment on the FCE, Dr. Ross wrote a letter stating that the FCE report showed repeated valid efforts and demonstrated Dr. Kaviani does not have the physical functional capabilities to safely perform several material requirements of his profession. [AR 1234].

44.     In his sworn statement, Dr. Sharfman stated Dr. Kaviani's daily headaches are corroborated by objective medical evidence and noted that the headaches would interfere with his ability to tend to a patient because, "when we're in pain, our concentration is decreased, our mental focus is decreased, our memory is decreased, and it would not be safe for him to be performing a dental procedure where he was not at his full capacity." [AR 1235-1252 at 1241-1243].

45.     The letter submitted from Andrew Greenberg, DDS, of Greenberg Dental, noted that Dr. Kaviani was an integral part of the dental group, was a hard-worker, and would still be employed with the group had it not been for his failing health. [AR 1264].

---

[2] UE is a commonly used abbreviation for upper extremity. ROM is a commonly used abbreviation for range of motion.

46.     Dr. Wender summarized his report by stating that he found "within a reasonable degree of medical probability that Dr. Kaviani has objective medical evidence, based upon [his] review of the available records and diagnostic studies, which corroborate his complaints and corroborate his restrictions and limitations." [AR 1253-1261 at 1260].

47.     Dr. Wender expressed disagreement with Dr. Gerstenblitt's conclusions, believes the FCE test results to be valid, and does not think Dr. Kaviani's limitations are self-imposed. [AR 1260].

48.     Dr. Wender opined that "based upon the objective data it would be inappropriate within a reasonable degree of medical probability to allow Dr. Kaviani to continue the practice of dentistry without placing both his patients, as well as himself at risk." [AR 1260].

49.     In her declaration, Joan Olivar, a former co-worker who worked alongside Dr. Kaviani as a dental assistant, stated that she "observed Dr. Kaviani shaking his hands because of the pain, having difficulty using dental instruments with his right hand, and often changing positions and stretching because of discomfort." Ms. Olivar stated that she saw Dr. Kaviani drop an instrument on a few occasions while working on a patient. [AR 1263].

50.     In her declaration, Madeline Rivera, who also worked alongside Dr. Kaviani as a dental assistant, stated that on a few occasions, she "witnessed him drop instruments during lengthy dental procedures." [AR 1262].

**RSL's Appeal Review**

51.     In response to Dr. Kaviani's appeal, RSL requested that Dr. James W. Butler conduct a medical review. [AR 189].

11

52.     In his report, dated October 5, 2016, Dr. Butler concluded that Dr. Kaviani could perform sedentary or light work, but would not state that Dr. Kaviani could complete his own occupation as a dentist. [AR 1443-1459; 1458-1459].

53.     According to Dr. Butler, "there was an FCE that has been deemed invalid," but he provided no information as to who had deemed the FCE invalid [AR 1456].

54.     Dr. Butler stated that pain is an intolerance event and "you do not apply restrictions based on intolerance." [AR 1458]. He elaborated, "whether [Dr. Kaviani] sits at home or whether he works, he still has pain in his neck. Whether he sits at home or drives somewhere or works, he still has pain in his neck." [AR 1458].

55.     Although not requested of him, Dr. Butler discussed the value of Dr. Kaviani's Policy in his report and assessment. [AR 1457].

56.     He also stated that Dr. Kaviani had many reasons not to improve, but did not indicate what those reasons were. [AR 1457].

57.     Dr. Butler acknowledged that he was not provided with information about Dr. Kaviani's financial situation, his family life, or his level of fulfillment in relation to his ability to work at the time of his report. [AR 1443-1459; Ex. B - Butler Dep., 45:21-25, 46:1-21].

58.     In response to RSL's prompt, Dr. Butler provided an addendum report on October 15, 2016, in which he opined Dr. Kaviani could complete sedentary work. [AR 1468-69].

59.     Dr. Butler was not asked to give an opinion on whether Dr. Kaviani could work as a dentist. [Ex. B - Butler Dep., 44:9-11].

60.     Nonetheless, in his initial report, Dr. Butler noted that "it is difficult to state that he can do his full work because he perceives himself to be a safety issue for his patients, therefore, he is." [AR 1458-1459].

12

61.     Dr. Butler noted his concern for patient safety when a dentist is taking chronic pain medications such as opiate or opiate-like medications. [AR 1459].

62.     When asked whether he would advise Dr. Kaviani to complete patient care, Dr. Butler responded "Is it fair to say I wouldn't go to him as a dentist? Yes." [Ex. B - Butler Dep., 44:24-25].

63.     By letter dated November 8, 2016, RSL denied Dr. Kaviani's appeal. [AR 185-194].

**General**

64.     Every doctor who treated Dr. Kaviani, reviewed his records, and/or examined him in relation to his claim for LTD benefits voiced a concern for patient safety. [AR 1106-1119 at 1119; 1443-1459 at 1458-59; 1235-1252 at 1243; 1172-1183 at 1181-82; 1143-1169 at 1144; 1253-1261 at 1259; 888-889; Ex. B - Butler Dep. at 43:21-25, 44:1-25; Ex. A - Gerstenblitt Dep. at 52:21-25, 53:1-4].

65.     RSL did not follow up with Drs. Butler or Gerstenblitt in regard to their safety concerns. [See AR generally].

## IV.    STANDARD OF REVIEW

### A.     Summary Judgment Standard

In most cases, a motion for summary judgment is granted when the evidence on file shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In an ERISA benefits dispute, however, "the 'standard' summary judgment considerations do not apply." *See Hert v. Prudential Ins. Co. of Am.*, 650 F. Supp. 2d 1180, 1190 (M.D. Fla. 2009). Instead, here, summary judgment is merely the conduit to

bring the legal question before the district court. *See Crume v. Metro. Life Ins. Co.,* 417 F. Supp. 2d 1258, 1272 (M.D. Fla. 2006).

**B.    ERISA Standard of Review**

Under ERISA's civil enforcement provisions, a plan participant may bring a civil action against the plan administrator to recover wrongfully denied benefits due to him under the terms of the plan. *See* 29 U.S.C. § 1132(a)(1). ERISA, however, does not promulgate standards under which district courts must review denied benefits. *Firestone Tire & Rubber Co. v Bruch,* 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989). To fill this void, the Supreme Court has articulated a framework for judicial review, which the Eleventh Circuit has distilled into a six-part test. *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 672 (11th Cir. 2014). A court reviewing a plan administrator's benefits decision should conduct the following multi-step analysis:

(1) Apply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

(2) If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end the inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011).

14

The conflict of interest is one of many factors to take into account when determining whether the denial of benefits was reasonable at step three. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195-1196 (11th Cir. 2010).

## V.    RSL's DENIAL OF BENEFITS WAS WRONG AND UNREASONABLE

RSL's failed to make a reasoned determination based on a diligent investigation as is required of an ERISA fiduciary. *See Capone*, 592 F.3d 1189, 1200 (11th Cir. 2010). RSL failed to reasonably and neutrally evaluate Dr. Kaviani's claim when it: (1) ignored and de-emphasized substantial evidence of disability; (2) failed to investigate significant patient safety concerns related to Dr. Kaviani's ability to work as a dentist; and, (3) adopted the opinions of its reviewing physicians even when those opinions were contrary to the terms of the Policy.

### A.    RSL Ignored and De-emphasized Substantial Evidence of Disability

Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823, 123 S. Ct. 1965, 1966, 155 L. Ed. 2d 1034 (2003); *see also Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1199 (11th Cir. 2007), *reh'g granted*, *opinion vacated in part,* 506 F.3d 1316 (11th Cir. 2007), and *adhered to in part on reh'g sub nom. Oliver v. Coca-Cola Co.*, 546 F.3d 1353 (11th Cir. 2008) (finding Coca-Cola's decision to be arbitrary and capricious based in part on the fact that Oliver presented a plethora of medical evidence in support of his disability claim, which Coca-Cola "simply ignored . . . in order to arrive at the conclusion it desired."). Nor can an administrator de-emphasize evidence which favors an approval of benefits, while emphasizing evidence that favors a denial of benefits. *Glenn*, 554 U.S. at 118 (affirming the lower court's decision to set aside MetLife's discretionary decision where the lower court found that MetLife had emphasized a certain medical report that favored a denial of benefits and had de-emphasized certain other reports that suggested a contrary conclusion);

*Franklin v. Hartford Life Ins. Co.,* 2008 WL 5110836, at *12 (M.D. Fla. 2008) (finding Hartford's decision to be arbitrary and capricious in part because Hartford "emphasized certain medical reports that favor a termination of benefits while de-emphasizing other reports that suggest a contrary conclusion."); *Gharagozloo v. Aetna Life Ins. Co.*, 2009 WL 3753589, * 25 (S.D. Fla. 2009) (finding that the administrator acted unreasonably by disregarding consistent findings from Plaintiff's treating physicians and an independent medical examiner and instead, basing its decision on two reviewing physicians' opinions).[3] Instead, the plan administrator must fairly weigh all of the evidence before it.

Here, RSL de-emphasized, or ignored entirely, evidence supporting an approval of Dr. Kaviani's claim and overemphasized evidence supporting a denial.  By doing so, RSL failed to act as a neutral plan administrator and instead, revealed itself as an interested party, advocating for a particular outcome.[4]

### 1.     *Dr. Kaviani Submitted Substantial Evidence of Disability*

According to the Policy, RSL will pay a monthly benefit if the insured (1) is Totally Disabled as the result of a Sickness or Injury covered by this Policy, (2) is under the regular care

---

[3] *See also Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 777 (7th Cir. 2010) (finding MetLife's selective consideration of the evidence in a way not reasonably consistent with the entire picture to be a "hallmark of an arbitrary and capricious decision."); *Leger v. Tribune Co. Long Term Disability Ben. Plan*, 557 F.3d 823, 835 (7th Cir. 2009) (holding the Plan acted arbitrarily and capriciously by failing to consider Ms. Leger's complete medical history and rejecting, without explanation, supportive medical evidence, like the FCE); *Castle & Govindarajan v. FMC Corp.*, 932 F.2d 634, 637 (7th Cir. 1991) (a selective review of the evidence is an abuse of discretion and will support reversal of the administrator's decision); *Gellerman v. Jefferson Pilot Financial Ins. Co.*, 376 F. Supp. 2d 724, 733-34 (S.D. Tex. 2005) ("An administrator is not allowed to pick and choose evidence on which to rely as it did in this case. This manner of handling the evidence amounts to an abuse of discretion because the defendants ignored key statements and conclusions in the FCE.").

[4] An outcome that would benefit the entity responsible for paying out claims – RSL.

of a Physician, (3) has completed the Elimination Period, and (4) submits satisfactory proof of Total Disability.

Dr. Kaviani has submitted *extensive* proof of his Total Disability. Indeed, it is difficult to imagine what more Dr. Kaviani could have provided to satisfy RSL. As it is, Dr. Kaviani has produced written documentation that he is unable to complete the substantial and material duties of his occupation as a dentist from: (1) his treating physician, Dr. Richard Smith; (2) Jaime Sigurdsson, CEAS and Michael Yarvi, OTR/L, who conducted a functional capacity evaluation; (3) Dr. David Ross, who conducted an independent medical examination and a neurophysiologic pain profile report; (4) Dr. Marc Sharfman, his neurologist; (5) Dr. Stephen Wender, who conducted an independent review of Dr. Kaviani's entire medical file; and, (6) Dr. Andrew Greenberg, Madeline Rivera, and Joan Olivar, who all worked with Dr. Kaviani and provided statements regarding his inability to complete his duties at Greenberg Dental.

  i.  <u>Dr. Richard Smith</u>

Dr. Kaviani's claim submission and subsequent appeal included copious medical records from his treating physician, Dr. Richard Smith. [AR 207-208; 1138-1139; 949-950; 905-907; 888-0891; 402-479]. These records included a Physician's Statement, which indicated that Dr. Kaviani suffers from neck pain, tingling/ numbness in both upper extremities as a result of diagnoses of cervical HNP (herniated nucleus pulposus) and brachial radiculitis. [AR 207-208]. In the Physician's Statement, Dr. Smith communicated the same message he communicated in his office visit notes – that Dr. Kaviani *should not* continue working as a dentist. [AR 207-208; 888-889; 890-891; 407].

The records also contained Dr. Kaviani's <u>abnormal</u> June 23, 2015 MRI report, which showed bulging discs with anterior impression on the thecal sac at C4-5 and C5-6 and focal

posterior disc herniation with disc bulge and anterior impression on the thecal sac at C6-7. [AR 408-409]. The MRI report is consistent with Dr. Kaviani's symptoms and the objective physical examination findings (in Dr. Smith's records) of diminished neck strength and range of motion as shown in diminished flexion 4/5, rotation 4/5, lateral flexion 4/5, diminished reflexes bilaterally, and a positive Spurling's test. [AR 406-407].

ii.   *Functional Capacity Evaluation*

In preparation for his appeal, Dr. Kaviani underwent a comprehensive functional capacity evaluation ("FCE") in order to put to rest RSL's claim that he had not provided sufficient proof of disability. [AR 1143-1169; 1282-1290]. The evaluation was administered with the guidance of an occupational therapist, Michael Yarvi, whose focus on assessing Dr. Kaviani's ability to do the essential job duties of a dentist truly makes this testing the best means of determining occupational disability. In addition to the physical testing expected in a traditional FCE, Mr. Yarvi tested Dr. Kaviani's ability to carry out specific dental duties. [AR 1143-1169].

As seen from the 25-page report, Dr. Kaviani failed to meet many of the essential physical requirements necessary to repeatedly, reliably, and safely perform the duties of a dentist. [AR 1146-1169]. Dr. Kaviani demonstrated below functional range of motion for cervical flexion, cervical extension, bilateral cervical lateral flexion, and bilateral cervical rotation. [AR 1166]. He demonstrated below functional strength for right shoulder flexion and right shoulder abduction. [AR 1166]. Dr. Kaviani failed to meet the physical demands necessary for his occupation in the categories of lifting floor to waist, lifting waist to overhead, carrying, reaching, stooping, twisting, and handling. [AR 1158].

The evaluators then turned to the occupation-specific testing and evaluated Dr. Kaviani's ability to perform patient exams and dental procedures. He was unable to meet the physical

demands of either task. [AR 1164]. Regarding his ability to complete patient exams, the FCE report states that Dr. Kaviani was, "[u]nable to maintain the position (slightly stooped) with twisting of the cervical region intermittently to see all areas of client's mouth. In addition client was unable to perform static hold of small tools with right UE required to perform complete exam." [AR 1164]. Regarding Dr. Kaviani's ability to complete dental procedures, the FCE report states, "[l]imited use of right UE with significant weakness and limited endurance noted during testing." [AR 1164]. The report concludes, "Dr. Kaviani should not return to work as a Dentist at this time due to his inability to perform the essential job demands safely . . . Mr. Kaviani's work capacity is Sedentary with minimal use of the right [upper extremity]." [AR 1144].

In addition to occupation-specific testing, the FCE included tasks and tests specifically tailored to determine the validity and sincerity of Dr. Kaviani's efforts during the evaluation. [AR 1143-1169]. The FCE report concludes, "[t]he results of this evaluation show that Dr. Kaviani *demonstrated consistent and maximal effort*. The test results and referral diagnosis correlate. Therefore this FCE is a *reliable indication of his true functional abilities at this time*." [AR 1144] (emphasis added). This conclusion was backed up with data from each validity test, which included multiple iterations of the JAMAR hand test, pinch grip testing, and distraction testing. [AR 1148-1154]. In addition to the general validity testing, the evaluator specifically noted that Dr. Kaviani demonstrated no symptom magnification. [AR 1155]. Thus, the validity of the FCE results are not in question.

19

iii.     *Independent Medical Examination & Neurophysiological Pain Profile Report by Dr. David Ross*

Carried-out by David Ross, M.D., the independent medical examination ("IME") included a Neurophysiologic Pain Profile ("NP3") report.[5] [AR 1177-1183; 1172-1176]. Dr. Ross examined Dr. Kaviani, reviewed all the medical records associated with his treatment, and assessed his pain profile.

According to Dr. Ross's testing, Dr. Kaviani's "**pain complaints increased after a relatively short period of neck flexion [15 minutes]**" and these "**complaints were associated with increased autonomic responses consistent with [his] verbalized complaints.**" [AR 1174] (emphasis added). Dr. Ross' professional medical opinion is that, "**[g]iven the nature of Dr. Kaviani's profession, he cannot safely perform his work obligations.**" [AR 1182] (emphasis added).  Dr. Ross added that, "[e]ven with further treatment, it is improbable that he will be able to return to work as a dentist in the foreseeable future." [AR 1182].

In order to maintain the integrity of Dr. Ross's IME, he was not made aware that Dr. Kaviani previously underwent an FCE. Instead, after Dr. Ross provided his IME report, he was asked to comment on the FCE findings. In his addendum letter, Dr. Ross wrote that the FCE "showed repeated valid efforts," which "indicates that the test is an accurate reflection of his overall capabilities." With respect to the test data, Dr. Ross observed that:

> The test reveals strength deficits involving the right arm and hand compared to the left side. Many of the tests show that the patient's right-sided strength [in a variety of activities] fails (sic) below usual range [compared to normative group]. Finally, when one compares Dr. Kaviani's results to the work requirements of a dentist (according to the Dictionary of Titles); his functional capabilities do not meet his job requirements; i.e., it is unsafe for him to return to his occupation at the present time.

_____

[5] Also included with Dr. Kaviani's appeal letter was "The NP3 Guide" a reference guide for neurophysiologic pain profile testing. It can be found at AR 1184-1227 for the Court's review.

[AR 1234] (emphasis added). According to Dr. Ross, the FCE results "confirm and extend" his medical evaluation. [AR 1234].

    *iv.*    <u>*Sworn Statement of Marc Sharfman, M.D.*</u>

Shortly after the 2012 automobile accident, Dr. Kaviani began treating with a neurologist, Dr. Marc Sharfman. On June 10, 2016, Dr. Sharfman gave a statement under oath during which he conveyed his professional medical opinion that headaches disabled Dr. Kaviani from being a dentist. [AR 1235-1252]. Dr. Sharfman explained that Dr. Kaviani's headaches prevent him from attending to patients because concentration, mental focus, and memory decrease when someone is in pain, "and it would not be safe for him to be performing a dental procedure where he was not at his full capacity." [AR 1243].

Dr. Sharfman explained that the four diagnoses he gave – posttraumatic headache, posttraumatic occipital neuralgia, posttraumatic cervical cranial syndrome, and posttraumatic cervical disc herniation – all relate back to the 2012 accident. [AR 1239-1240]. The diagnoses were based on "physical examination that demonstrated tenderness over the greater occipital notches, the back part of the head, an exam in which I found muscle spasm and decreased range of motion in the cervical spine . . . and an MRI of the cervical spine that showed a disc herniation." [AR 1240-1241].

With respect to the findings on the cervical spine MRI dated June 23, 2015, Dr. Sharfman explained that the MRI further corroborated Dr. Kaviani's complaints of headaches because the nature of his headaches is consistent with a disc herniation in that region of the spine. [AR 1241]. More specifically, Dr. Sharfman provided the following medical explanation:

> The brain itself does not cause pain. Pain is produced from the trigeminal nerve. The trigeminal nerve is a cranial nerve, a nerve that is in the brain, but it also

descends into the cervical spinal cord and interacts with cervical nerves. The way I explain this to the patients is if we have a highway system, there's different roads we can get on the highway, different roads we can get off the highway. So this trigeminal nerve goes down the highway and interacts with the nerves from the cervical spine that are coming up the highway. So the disc irritates the cervical nerve. The cervical nerve sends the impulse to the trigeminal nerve. The trigeminal nerve sends it to the brain. Dr. Kaviani then feels pain.

[AR 1242].

> v.    _Peer Review of Medical Records by Stephen S. Wender, M.D._

Independent orthopedic surgeon Dr. Stephen Wender was consulted to review _all_ medical records and information, including Dr. Gerstenblitt's report (RSL's IME). Based on the totality of medical evidence presented, Dr. Wender opined that Dr. Kaviani:

> . . . **without question has objective medical evidence to support the restrictions and limitations which would make Dr. Kaviani unable to practice as a dentist**, given his significant restriction in cervical range of motion coupled with his upper extremity radicular complaints which have now lasted approximately 4 years. **It is unlikely within a reasonable degree of medical probability they will improve and more likely than not the continuing practice of a dentist will only worsen his cervical radicular condition, as well as likely place his patients at risk. As Dr. Kaviani is a right-handed dentist and his complaints of numbness and weakness in his right upper extremity are supported by his objective MRI findings, Dr. Kaviani is clearly at increased risk to injure a patient, as well as himself if he continues to practice.**

[AR 1259] (emphasis added).

> vi.    _Statements of Dr. Andrew Greenberg, Madeline Rivera, and Joan Olivar_

Also submitted to RSL was a letter from Dr. Andrew Greenberg and declarations from Madeline Rivera and Joan Olivar, all of whom worked at Greenberg Dental. [AR 1262-1264].

In his letter, Dr. Greenberg, owner of Greenberg Dental, indicated a good professional-relationship existed between Dr. Kaviani and the practice, and he acknowledged that failing health led to Dr. Kaviani's departure. [AR 1264]. Ms. Rivera and Ms. Olivar both submitted declarations documenting their personal observations as dental assistants at Greenberg Dental. [AR 1262;

1263]. They both observed that Dr. Kaviani was unable to complete his normal duties in the office. [Id.] *They observed him dropping dental instruments and struggling to finish lengthy procedures.* [Id]. They noted that they were the ones Dr. Kaviani called for assistance when his pain and numbness caused him to be unable to continue working. [Id.].

2.    *RSL Failed to Give Proper Weight to Dr. Kaviani's Evidence of Disability*

Against this evidentiary medical backdrop, RSL should have approved Dr. Kaviani's benefits no matter how costly the claim. Instead, RSL maintained that Dr. Kaviani did not submit satisfactory proof of Total Disability. [AR 169-178 at 176-177; 185-194 at 193]. In its appeal denial letter, RSL stated there was a "lack of materials provided to support [his] alleged impairment" and maintained, in the face of evidence (medical and otherwise) to the contrary, that Dr. Kaviani's limitations were based only on "self-reported" or "subjective" symptoms. [AR 185-194 at 193].

In reaching this conclusion, RSL relied entirely on the reports of Drs. Gerstenblitt and Butler, even when those reports were contradicted by evidence in the file. Like in *Gharagozloo*, RSL's devotion to and reliance on its reviewing physicians was unwarranted. 2009 WL 3753589, at *25. Dr. Gerstenblitt, for example, never reviewed the evidence Dr. Kaviani submitted with his appeal, so his opinion in regard to most of the evidence in the record is severely limited. Nevertheless, RSL cited his opinion extensively in its appeal denial letter. [AR 187-189].

Dr. Butler, in turn, based his opinion on a factually suspicious narrative he himself created. In his report, Dr. Butler stated that the prognosis is poor because Dr. Kaviani decided himself he could not do his occupation (implying that his his doctors simply agreed), he engaged an attorney early on, he has a high dollar disability policy, and he has many reasons not to improve. [AR 1457]. Dr. Butler's job as a reviewing doctor was not to speculate about Dr. Kaviani's life and determine

23

whether disability "fits" into the narrative. His job was to review the *medical* evidence and issue a *medical* opinion.

This makes sense considering Dr. Butler does not really know the factual circumstances of Dr. Kaviani's life. Dr. Butler was not present during the conversations between Dr. Kaviani and his doctors - he has no idea how the discussions regarding his ability to work unfolded. There is certainly no evidence that any of Dr. Kaviani's doctors said, "sure you cannot do your job" as Dr. Butler implied in his report. [AR 1457]. Furthermore, in his deposition, Dr. Butler revealed that he did not know whether Dr. Kaviani would make more money on disability than working as a dentist. [Ex. B - Butler Dep., 45:11-25, 46:1-11]. Nor did he know whether Dr. Kaviani's wife would be happier with him working or collecting disability benefits. [Id. at 46:12-16]. He even opined that he suspected Dr. Kaviani would be *less* fulfilled were he to stop working. [Id. at 46:17-21]. There is a reason reviewing physicians are asked very specific *medical* questions. Once it became clear Dr. Butler's opinion was based on tangential and unsupported speculation, RSL should have, at the very least, viewed his report with a dash of skepticism. Instead, RSL pledged its allegiance by copying and pasting Dr. Butler's opinion directly into its appeal denial letter. [AR 189].

At the same time, RSL applied extreme skepticism to Dr. Kaviani's evidence of disability. RSL's contention that Dr. Kaviani did not submit satisfactory proof of disability begs the question of whether there was any way to satisfy RSL. No matter what Dr. Kaviani submitted, RSL found a way to discount or diminish its importance. When Dr. Kaviani submitted an abnormal MRI showing multiple disc bulges and a herniated disc impinging on the thecal sac, RSL adopted Dr. Gerstenblitt's unexplained conclusion that the MRI is "basically normal," and "extremely

unimpressive."[6] [AR 187-188]. RSL seemed unmoved by the opinions of four doctors (Drs. Ross, Sharfman, Smith, and Wender), who all found the MRI to be significant objective medical evidence corroborating Dr. Kaviani's reported complaints of pain, numbness, tingling, and right upper extremity weakness. In fact, their positions regarding the MRI were never mentioned in RSL's denial letters. [AR 169-178; 185-194].

When Dr. Gerstenblitt found decreased range of motion during his physical examination of Dr. Kaviani, which was corroborated by the physical examination notes of Dr. Kaviani's treating physician, Dr. Richard Smith, RSL discounted the evidence as "not reliable" and overly subjective. [AR 187; 190]. When Dr. Sharfman's May 9, 2016 office visit notes documented physical examination findings of cervical spasms, decreased range of motion, tenderness, and decreased sensation, RSL ignored those objective findings entirely, then in a post hoc rationale, attempted to minimize the significance of this type of objective evidence. [AR 1140-1141; Ex. C – *Supp. Resp. to Pl's Req. for Adm. Nos. 2-5*].[7] When Dr. Kaviani's orthopedic surgeon stated that he could be a candidate for cervical spine surgery, RSL deferred instead to Dr. Gerstenblitt, who is not a surgeon, and who never reviewed Dr. Kaviani's records on appeal. [AR 1114].

When Dr. Kaviani submitted the Neurophysiologic Pain Profile Report from Dr. Ross, RSL failed to acknowledge it at all even when Dr. Butler himself stated, "[Dr. Kaviani] does have pain

---

[6] Dr. Butler's opinion is repetitive of Dr. Gerstenblitt's, indicating that he too adopted his position.
[7] RSL admitted that physical examination findings are objective evidence of those findings (so, cranial muscle spasms are objective evidence of cranial muscle spasms, reduced range of motion is objective evidence of reduced range of motion, etc.), but denied that physical examination findings could be objective evidence of disability. [Ex. C - *Supp. Resp. to Pl's Req. for Adm. Nos. 2-5*]. But requiring objective evidence of disability is an impossibility. No physical test could ever determine if the policy language is satisfied (though an FCE comes close). Instead, objective evidence is used to prove the underlying condition – the source of the disability. Dr. Kaviani's objective evidence proves his pain and should have been given weight.

as Dr. Ross has proven." [AR 190]. Instead, RSL proceeded as if the pain profile report did not exist and concluded "Dr. Ross's opinions are based on Dr. Kaviani's 'verbal complaints' and 'self-reported' limitations only." [AR 192]. RSL really missed the boat here. The entire purpose of Dr. Ross's report was to test whether Dr. Kaviani's complaints of pain were corroborated with measurable autonomic responses. The testing concluded that Dr. Kaviani's increased complaints of pain as he completed neck flexion were "associated with increased autonomic responses consistent with the patient's verbalized complaints." [AR 1172-1174 at 1174]. It is clear RSL did not consider this testing at all in its appeal denial.

When Dr. Kaviani submitted a sworn statement from neurologist, Dr. Marc Sharfman, which supported Dr. Kaviani's claim, RSL discounted the entire sworn statement based on one office visit note where Dr. Smith noted "no headaches." [AR 191]. RSL gave no further analysis or explanation. RSL did not discount Dr. Sharfman altogether, though, because when Dr. Sharfman said something supportive of a denial, RSL found his notes to be compelling medical evidence. In its appeal denial letter, RSL noted "[o]n May 9, 2016, Dr. Sharfman also documented that Dr. Kaviani's "[t]one and power are normal in the bilateral UE and LE grip 5/5." [AR 191]. Of course, Dr. Kaviani is right-handed and holds his dental instruments in his right hand so a left extremity of 5/5 has limited significance for a decision on his ability to work as a dentist. Despite the limited usefulness of the statement itself, RSL's reliance on it is telling.

When Dr. Kaviani submitted the peer review report from Dr. Stephen Wender, RSL failed to address it and instead discounted the entire report by noting that Drs. Wender and Ross expressed a difference of opinion regarding the efficacy of MRIs. [AR 192]. By pointing out this difference, RSL seems to think it was justified in ignoring the entirety of Dr. Wender's report and his conclusion that "based upon the objective data it would be inappropriate within a reasonable

degree of medical probability to allow Dr. Kaviani to continue the practice of dentistry without placing both his patients, as well as himself at risk." [AR 1253-1261 at 1260]. This consistent treatment of evidence favoring disability is not justified.

In fact, RSL's true colors show most clearly when one examines RSL's inconsistent treatment of Drs. Gerstenblitt and Butler's reports. When these doctors expressed doubt as to Dr. Kaviani's ability to *safely* practice as a dentist, RSL ignored them. And, when Dr. Gerstenblitt noted specific concern with Dr. Kaviani's ability to complete firm grasping, RSL failed to accept that limitation on its face, and took action to explain away Dr. Gerstenblitt's concerns. [AR 1116, which shows that RSL asked Dr. Gerstenblitt *why* he had given the restriction of only occasional firm grasping.]. When the FCE report then *confirmed* Dr. Gerstenblitt's concern with firm grasping, RSL still did not acknowledge the limitation.

RSL's pattern is obvious. If evidence supported a denial of benefits, it was accepted without question. If evidence supported an approval of benefits, it was discounted, diminished, and dismissed. This is the behavior of an advocate, not a neutral arbiter, and is indicative of a conflict of interest.  RSL cannot claim it acted as a fiduciary, while blatantly pursuing an agenda.

### 3.    *RSL Failed to Consider the FCE Report*

Unable to explain away the results of the FCE, RSL completely dismissed it because "two independent physicians, Drs. Gerstenblitt and Butler indicated that an FCE was not warranted, such examinations are 'notoriously unsuccessful in determining if someone can truly work who does not want to or who perceives themselves to be disabled.'" [AR 191].

The problem for RSL is that Courts agree that an FCE is "the best means of assessing an individual's functional level." *Lake v. Hartford Life and Acc. Ins. Co.*, 320 F. Supp. 2d 1240, 1249 (M.D. Fla. 2004) (supporting Hartford's reliance on an FCE and observing that despite any

27

limitations, a functional capacity evaluation remains the most accurate means of assessing functionality); *see also Madison v. Greater Georgia Life Ins. Co.*, 2016 WL 8648862, * 11 (N.D. Ga. 2016) (stating that "FCEs *do* provide a reliable, objective assessment of an individual's work-related function level").[8] Furthermore, courts have recognized that the physical therapists who complete such testing are "licensed, trained professionals well-suited to assessing whether a given injury impacts functional ability." *Madison v. Greater Georgia Life Ins. Co.*, 2016 WL 8648862, * 11 (N.D. Ga. 2016).

An FCE is especially reliable when it contains testing specific to the individual's occupation and testing to assess the validity of the results. *See Madison*, 2016 WL 8648862, at *10-12 (acknowledging the concern that claimants can "sandbag" the testing, but also recognizing that an evaluation can "contain[] safeguards against such shenanigans"). Because of their reliability, plan administrators cannot ignore evidence from an FCE. *Id.; see also Holmstron v. Metro. Life Ins. Co.*, 615 F.3d 758, 770 (7th Cir. 2010) (finding that MetLife acted arbitrarily when it failed to offer a substantive explanation for rejecting a thorough FCE report); *Gellerman v. Jefferson Pilot Financial Ins. Co.*, 376 F. Supp. 2d 724, 733-34 (S.D. Tex. 2005) (finding an abuse of discretion because the defendants ignored key statements and conclusions in the FCE).

---

[8] Indeed, Courts in the Eleventh Circuit regularly *uphold* administrators' benefits decisions based on the understanding that an FCE is reliable evidence. *Townsend v. Delta Family-Care Disability and Survivorship Plan*, 295 Fed. App'x. 971, 977 (11th Cir. 2008) (affirming summary judgment for administrator that relied on FCE in denying benefits); *Moeller v. Guardian Life Ins. Co.*, 2011 WL 7981954, *8 (M.D. Fla. 2011) (finding that the FCE which showed Plaintiff could perform sedentary to light work supports the administrator's determination that Plaintiff was not totally disabled from any gainful work.); *Ness v. Aetna Life Ins. Co.*, 2017 WL 2800521, at *7 (M.D. Fla. 2017) (finding Plaintiff's contention that a physical therapist's FCE report is not reliable evidence to be without merit).

Here, the FCE was completed by a trained physical therapist, contained occupation-specific testing, and included validity testing. [AR 1143-1169]. Despite this, RSL dismissed it based largely on the opinion of Dr. Gerstenblitt who *predicted* that an FCE would not be helpful. To be clear, Dr. Gerstenblitt <u>never</u> <u>reviewed</u> the FCE report. Thus, RSL took Dr. Gerstenblitt's generalized statement about FCE reports and applied it to a very specific piece of evidence that courts favor as evidence for determining disability.

To the extent that RSL's dismissal of the FCE report was based on Dr. Butler's opinion, that weight was greatly misplaced. It seems clear that Dr. Butler did not read and analyze the report himself, but rather, adopted Dr. Gerstenblitt's generalized statement that an FCE would be invalid. Dr. Butler stated in his report that "there was an FCE that has been deemed invalid." [AR 1456]. Dr. Butler did not state who had deemed the FCE invalid, or why it had been deemed invalid in the face of multiple tests aimed specifically at ensuring validity. [AR 1456]. Dr. Butler then went on to assert that "[t]he FCE is notoriously unsuccessful in determining if someone can truly work who does not want to or who perceives themselves to be disabled." [AR 1457]. No further discussion of the FCE occurred.

While Drs. Gerstenblitt and Butler are not charged with understanding the treatment courts give FCEs, RSL is. Surely, if RSL had its own FCE cutting against disability, it would have latched-on to it as it did with every piece of evidence it found favored a denial. Indeed, RSL admitted in its responses to Dr. Kaviani's interrogatories that it has used a functional capacity evaluation as part of an investigation for pain-related claims. [Ex. C, *Supp. Resp. to Pl's Interrog. No. 16*]. As the fiduciary charged with making a neutral benefits determination, RSL had a duty to insist that the FCE was properly considered. By failing to do so, RSL again revealed itself as an interested party concerned with avoiding a maximum benefit claim rather than a neutral arbiter.

29

### B.       RSL Failed to Properly Investigate Serious Safety Concerns

Every doctor who treated Dr. Kaviani, reviewed his records, and/or examined him in relation to his claim for LTD benefits voiced a concern for patient safety should Dr. Kaviani continue to treat patients. [AR 1106-1119 at 1119; 1443-1459 at 1458-59; 1235-1252 at 1243; 1172-1183 at 1181-82; 1143-1169 at 1144; 1253-1261 at 1259; 888-889; Ex. A - Gerstenblitt Dep. at 52:4-25, 53:1-4; Ex. B - Butler Dep. at 43:21-25, 44:1-25]. As Dr. Gerstenblitt noted, "for whatever reason, if the examinee indicates he cannot grasp his tools or there could be a concern that he may injure a patient being that he is a dentist in drilling in someone's teeth and that decision would have to be made whether that is a reasonable risk involved in this case." By denying Dr. Kaviani's appeal, RSL apparently made the decision that it was willing to take that risk, but RSL reached its decision without further investigating the serious concerns for patient safety. Its failure to do so was unreasonable.

Under ERISA, a fiduciary has the "responsibility to fully investigate" claims before denying benefits. *Capone*, 592 F.3d 1189, 1200 (11th Cir. 2010); *see also Prelutsky v. Greater Georgia Life Ins. Co.*, 2017 WL 2406730, at *5 (11th Cir. 2017) (discussing *Capone* and noting that Aetna's investigation was deemed unreasonable because it made no attempt to interview witnesses who may have had information contradictory to the company's theory of the facts). The *Capone* Court explained that 29 U.S.C. § 1104(a)(1) mandates that a fiduciary shall "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use . . . ." *Id.* at 1199-1200. Consequently, Aetna, as a fiduciary, had the responsibility to fully investigate Capone's claims before denying benefits. *Id.* at 1200. The Court held that the denial of benefits without a proper

30

investigation was *de novo* wrong. *Id.; see Capone v. Aetna Life Ins. Co.*, *1:06-CV-3014-MHS* (N.D. Ga. 2010) (finding, on remand, Aetna's decision to deny benefits arbitrary and capricious in light of the Eleventh Circuit's ruling that its decision to deny benefits without a proper investigation was wrong).[9]

Twenty years before specifically discussing the issue of whether there was a duty to investigate in the context of an ERISA benefits claim, the Eleventh Circuit stated (in a footnote) that an ERISA fiduciary is required to make:

> an honest effort to ascertain the facts upon which its exercise must rest and an honest determination from such ascertained facts. . . If [the fiduciary] knew of matters concerning which honestly would require investigation, and failed to act, or if it knew of matters which would honestly compel a given determination and it announced to the contrary, it cannot, in law be regarded as having exercised good faith, and its action would be arbitrary. Thus, an improper motive sufficient to set aside a fiduciary's decision may be inferred from the fiduciary's failure to investigate or to interpret honestly evidence that greatly preponderates in one direction.

*Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566 n.11 (11th Cir. 1990). *See also, Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986) (A fiduciary's duty to investigate is a key facet of prudence and is often at the heart of fiduciary litigation); *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004) (ERISA fiduciaries "cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement").

Here, RSL willfully closed its eyes to uncontroverted evidence that Dr. Kaviani is unable to *safely* complete the substantial and material duties of his occupation as a dentist. In addition to concerns raised by *every* doctor who reviewed Dr. Kaviani's file, Dr. Kaviani also submitted

---

[9] A copy of the district court's decision on remand in *Capone* is attached hereto as Exhibit "D".

declarations from two dental assistants at Greenberg Dental who stated that they had personally witnessed Dr. Kaviani struggle to properly use dental tools and had personally witnessed him *drop instruments* while working on patients. [AR 1262; 1263].

In *Capone*, the court found fault with the insurance company's failure to interview witnesses who had direct knowledge of facts relevant to the case before denying the plaintiff's claim for benefits. *Capone*, 592 F.3d 1189, 1200.  RSL made the same omission. RSL never contacted Ms. Olivar or Ms. Rivera for more information, Indeed, in its Supplemental Responses to Plaintiff's Requests for Admission, RSL boldly admitted that it did not do so, then, contrary to *Capone*, refuted that it had any duty to do so. [Ex. C – *Supp. Resp. to Pl's Req. for Adm. Nos. 18-19*]. At the same time, RSL admitted that it would be unsafe for a dentist to drop dental tools while practicing dentistry on a patient. [Ex. C – *Supp. Resp. to Pl's Req. for Adm. No. 22*].  Even when the behavior observed by Ms. Olivar and Ms. Rivera was *confirmed* with objective medical evidence, RSL took no further action and denied benefits anyway. To do so was unreasonable.

### C.    RSL Adopted Opinions that are Contrary to the Terms of the Policy

As the plan administrator and fiduciary, RSL is the only actor who could determine whether Dr. Kaviani met the definition of Total Disability. Drs. Gerstenblitt and Butler could not do so, nor did they assert to do so. Instead, both doctors tried to answer the question of what Dr. Kaviani can do – what he is physically capable of doing. [Ex. A - Gerstenblitt Dep., 28:1-25, 37:7-10, 45:15-25; Ex B. - Butler Dep., 44:2-11 (confirming that he was never asked to elaborate on safety concerns because "I was asked what can he do. I wasn't asked what – can he be a dentist or not. I was never asked that")]. It is RSL's job to then take that information, process it, apply the Policy

terms, and make a final determination as to whether Dr. Kaviani is able to perform the substantial and material duties of his occupation as a dentist.[10]

Here, RSL acted unreasonably when it accepted and regurgitated the opinions of Drs. Gerstenblitt and Butler without asking itself whether those opinions were in line with the terms of the Policy. So, when both doctors described pain as a "tolerance event," which *they believe* cannot be the source of restrictions and limitations, RSL needed to ask whether the Policy excludes disability based on pain. When the doctors focused nearly exclusively on "clinical" or "objective" evidence as a prerequisite for restrictions, RSL needed to ask whether the Policy requires claimants to submit clinical or objective evidence. RSL failed to do so and, instead, cited those specific arguments as justification for denying Dr. Kaviani's benefits, when the Policy does not contain provisions that support them. [AR 193; 176; 1-31].

---

[10] Notably, plan administrators often conduct a transferable skills analysis, which looks at a list of restrictions and limitations and compares those restrictions to the demands of a specific occupation. RSL did not conduct a transferable skills analysis. Instead, RSL had a vocational specialist broadly identify the occupational requirements of a dentist, including categorizing dentistry as a light level occupation. [AR 926-928]. Then, RSL asked Drs. Gerstenblitt and Butler whether Dr. Kaviani could complete a light level occupation. RSL never answered for itself the question of whether Dr. Kaviani can actually complete the *specific* substantial and material duties of a dentist. Nor did RSL or the reviewing physicians address the fact that, per RSL's own vocational report, dentistry requires finger dexterity in the above 89th percentile and manual dexterity in the 67-89th percentile. [AR 926-928]. The occupation-specific FCE Dr. Kaviani submitted addressed these types of specific requirements, but RSL summarily dismissed it without valid reason.

Indeed, RSL probably should have consulted an expert given its clear inability to properly evaluate occupational duties. In its Supplemental Responses to Plaintiff's Requests for Admission Nos. 12-13, RSL would not admit that sitting at home is not comparable with performing dentistry duties. Nor would it admit that driving a car is not comparable with working as a dentist. [Ex. C – *Supp. Resp. to Req. for Adm. Nos. 12-13*].

The truth is, Drs. Gerstenblitt and Butler have a philosophy regarding pain that is contrary to the terms of the Policy and ERISA case law. In refuting Dr. Smith's recommendation that Dr. Kaviani change his occupation, Dr. Gerstenblitt stated, "[t]his appears to be strictly based on his self reports and self-imposed limitations and that is intolerance to work and not an issue of capacity. Restrictions are not based on intolerance or subjective pain complaints." [AR 1112]. Dr. Butler espoused a similar philosophy, even after he acknowledged that Dr. Kaviani *has proven* he experiences pain. According to Dr. Butler, there is still no reason for restrictions because "you do not apply restrictions based on intolerance." [AR 1458]. Dr. Butler's dismissal of pain as a disabling symptom (much less a symptom worsened by work) is illustrated by his comment that, "whether he sits at home or whether he works, he still has pain in his neck. Whether he sits at home or drives somewhere or works, he still has pain in his neck." [AR 1458].[11]

Besides the obvious criticism that this philosophy ignores what anyone who has ever experienced pain knows to be true – that pain can be exacerbated by certain activities and can, in fact, restrict one's ability to function – it also suffers the fatal flaw of being unsupported by the Policy. Dr. Kaviani's Policy includes a section titled, "Exclusions," which lists four causes of Total Disability that are not covered. [AR 22]. Pain is not one of them. Thus, RSL cannot deny a claim because the disability is based on pain. But, by accepting the doctors' reports, which very clearly noted they were giving no restrictions based on pain, RSL did just that.

To be sure, RSL will likely argue that pain itself is not limited, but pain based on self-reported symptoms is restricted. Still, this reads a requirement into the Policy that does not exist –

---

[11] Both doctors elaborated on this philosophy in their depositions and indicated that they make no secret of their position on pain. [Ex. A - Gerstenblitt Dep., 36-45; Ex. B - Butler Dep., 20-21, 41-42].

an objective medical evidence requirement. A plan administrator cannot require objective evidence of disability where the Policy does not require it and where the Policy does not exclude pain-related conditions. *Oliver*, 497 F.3d at 1196. The *Oliver* Court observed that much medical evidence, as it relates to pain, "is inherently 'subjective' in that it cannot be quantifiably measured." Thus, a plan cannot both purport to cover pain-related disabilities while rejecting the only evidence available to prove those disabilities.

Here, as in *Oliver*, Dr. Kaviani submitted every type of medical evidence he could to prove his Total Disability. For RSL to dismiss any evidence Drs. Gerstenblitt and Butler deemed "subjective" is not consistent with the terms of the Policy. This is especially true given that Dr. Kaviani's credibility was never called into question. Dr. Gerstenblitt, who met and examined Dr. Kaviani, found him to be honest and credible. [Ex. A - Gerstenblitt Dep., 50:14-21]. RSL, as the plan administrator, was obligated to consider *all* of the evidence, *then* apply the Policy terms. It seems to have missed the second step and instead, just parroted back the opinions of Drs. Gerstenblitt and Butler. To do so was unreasonable.

## VI.   CONCLUSION

RSL failed to reasonably execute its duty to perform a full and fair review. Instead, it revealed its self-interest every step of the way by ignoring and de-emphasizing substantial evidence of disability, failing to investigate serious safety concerns, and conveniently disregarding the terms of the Policy. The benefits denial based on this biased review cannot be upheld.

WHEREFORE, Plaintiff, Kia Kaviani, D.M.D., respectfully requests that this Court grant summary judgment in his favor, awarding his past-due monthly LTD benefits from the end of the elimination period – February 3, 2016 through present, including interest, and further grant him an award of attorney's fees and costs.

## VII.    REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 3.01(j), Plaintiff, Kia Kaviani, D.M.D., respectfully requests oral argument on his Motion for Summary Judgment and Incorporated Memorandum of Law. Given that the great majority of ERISA benefits decisions are disposed of on motions for summary judgment, it is not likely a bench trial will be required. The Court's decision-making process would be significantly aided by oral argument, as the Court would have an opportunity to obtain clarification of issues of fact in the record and ask questions regarding legal issues raised. Plaintiff estimates a total of two (2) hours will be necessary for argument.

*Respectfully submitted this 7th day of August, 2017,*

                                              */s/ Edward Philip Dabdoub*
                                              Edward Philip Dabdoub (FBN 45685)
                                              eddie@longtermdisability.net
                                              Carter Meader Sox (FBN 116907)
                                              carter@longtermdisability.net
                                              DABDOUB LAW FIRM, P.A.
                                              1600 Ponce de Leon Blvd, Suite 1205
                                              Coral Gables, Florida 33134
                                              Tel: (305) 754-2000
                                              Fax: (305) 754-2007
                                              *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing Motion with the Clerk of Court by using the CM/ECF system, which will, in turn, send a notice of electronic filing to Defendant's attorneys:

Anthony P. Strasius (FBN 988715)
anthony.strasius@wilsonelser.com
Tanya Suarez (FBN 86259)
Tanya.suarez@wilsonelser.com

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
100 SE 2nd St., Ste. 3800
Miami, FL 33131-2126
Tel: (305) 374-4400
Fax: (305) 579-0261


*/s/ Edward P. Dabdoub*
Edward P. Dabdoub

37